## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-631 (TJK)** |
| **THERESE BORGERDING,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. On April 26, 2024, a jury convicted defendant Therese Borgerding of five criminal charges under 18 U.S.C. § 231(a)(3) and (2), 18 U.S.C. §§ 1752(a)(1) and (a)(2), and 40 U.S.C §§ 5104(e)(2)(D) and (e)(2)(G).

For the reasons set forth herein, the government requests that this Court sentence Therese Borgerding to 13 months' incarceration, two years' supervised release, $2,000 in restitution, and the mandatory special assessment of $170. The Guidelines range, as calculated by the government, is 10 to 16 months' incarceration. The government recommends a midpoint sentence within this range. A 13-month sentence would be sufficient but no longer than necessary to account for Borgerding's participation in the riot and her utter lack of remorse for her actions on January 6.

## I.     INTRODUCTION

Borgerding participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote

1

count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

At approximately 7:00 a.m., Borgerding recorded a video of herself standing behind the bike rack barricades marking the restricted perimeter on the East Front of the building. Borgerding remained on the East Front of the building for several hours. By early afternoon, she again positioned herself directly behind the metal bike racks. At approximately 1:45 p.m., rioters to the right of Borgerding began pushing against those barricades, eventually breaching the perimeter at approximately 1:59 p.m. and storming towards the Capitol.

Borgerding participated in that breach. A few seconds after the initial breach of the barricades, she unhooked a pair of linked bike racks directly in front of her that were part of the restricted perimter, opening the way for herself and other rioters to rush towards the Capitol building. After storming towards the building, Borgerding encountered more police officers, and a chain link fence, on the Rotunda Steps. Along with the mob, Borgerding pushed past that police line and moved up the Rotunda Steps towards the Rotunda Doors. At the top of these stairs, she encountered officers—including United States Capitol Police (USCP) Officer Marc Carrion, who testified at trial—attempting to guard the Rotunda Doors and keep rioters from entering the

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

building. Nonetheless, she pushed her way into the building along with the mob, past the officers guarding the Rotunda Doors, and went straight to the Rotunda, where she remained for a few minutes. After exiting the Rotunda, she went to yet another floor of the building, the first floor. Borgerding exited the Capitol through a broken window next to the Senate Wing Door at approximately 2:54 p.m. In total, she remained within restricted Capitol grounds for nearly an hour and a half, at the very least.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts accompanying the Complaint filed in this case, ECF No. 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Borgerding's Role in the January 6, 2021 Attack on the Capitol

Borgerding, a vocal supporter of the right-wing conspiracy theory "QAnon"[2], arrived at the United States Capitol early on the morning of January 6, 2021 with a large homemade "Q" sign, as shown in Image 1:

---

[2] According to the Anti-Defamation League, "QAnon is a decentralized, far-right political movement rooted in a baseless conspiracy theory that the world is controlled by the "Deep State," a cabal of Satan-worshipping pedophiles, and that former President Donald Trump is the only person who can defeat it. . . . While not all QAnon adherents are extremists, QAnon-linked beliefs have inspired violent acts and have eroded trust in democratic institutions and the electoral process." "QAnon", Anti-Defamation League, available at https://www.adl.org/resources/backgrounder/qanon (last visited August 9, 2024).

3



*Image 1: Borgerding holding her Q sign on the East side of the Capitol building on January 6, 2021*

She carried that sign throughout the day on January 6.

Unlike many other Capitol rioters, Borgerding did not attend former President Trump's rally at the Ellipse. Instead, she went directly to the Capitol building early in the morning of January 6, arriving on the East Front by approximately 7:00 a.m.

She positioned herself directly behind the metal bike rack barricades marking the restricted perimeter on that side of the building. She filmed a video on her cell phone in which she said, "We are at the Capitol building. In Washington, D.C. It's 7 o'clock in the morning. Got us a great seat,

right up front. If anything big comes, we'll be ready." Exhibit 1.[3]

Borgerding remained on the East Front of the building for several hours as more rioters arrived. During this time, she posed for pictures with various people, holding her Q sign. Shortly before noon, a large group of Proud Boys, a known militant group, gathered near the East Front of the building. Borgerding, circled in yellow in Image 2 below and throughout this memorandum, stood in their immediate vicinity as they organized.



*Image 2: Still image from Exhibit 2 at 23:59 showing Borgerding holding her Q sign*

Borgerding remained near the Proud Boys contingent as they marched towards the Capitol building. She stood in front of the crowd of Proud Boys, posing with her Q sign, and asked "did you get this?," apparently to an individual taking a photograph and referring to her sign. Exhibit 2

---

[3] The government's exhibits 1 through 9 for the sentencing hearing are videos of the riot taken on January 6. Exhibits 10 and 11 are documents submitted to the Court by Borgerding.

at 30:45. Borgerding marched through the crowd of Proud Boys as they gathered on the East Front of the Capitol, chanting, "We love the Proud Boys! We love the Proud Boys!" Exhibit 3 at 0:25. Rioters close to Borgerding at this time wore tactical and other combat gear, including bullet-proof vests and military-style helmets. Someone in Borgerding's vicinity yelled over a megaphone, "They can't stop us! Storm the Capitol! Storm the Capitol! 1776!" *Id.*, beginning at 0:02.

Borgerding was again standing directly behind the metal bike rack barricades on the East Front of the building in the noon hour. The bike racks had been conjoined with latch and slot mechanisms to secure the barricades, as shown in Image 3 below.



*Image 3: Still image from Exhibit 5 showing interlocked bike racks at the East Front of the Capitol building on January 6*

6

A line of over twenty police officers stood directly in front of Borgerding, guarding those bike racks. Behind them, other officers stood closer to the Capitol building. At approximately 1:45 p.m., rioters just to the right of Borgerding began pushing against the barricades. At approximately 1:59 p.m., those rioters broke through the barricades and charged towards the Capitol. Borgerding saw this happen from where she stood. *See* Exhibit 4, beginning at timestamp 18:40 (Borgerding admitting that "there were other people shaking the gates and stuff"); Exhibit 5 (showing rioters breaching barricades). A few seconds later, Borgerding unhooked a pair of conjoined bicycle racks, as shown in Image 4 below and Government's Exhibit 5. That opened another breach point in those barricades and allowed herself and other rioters to charge towards the Capitol.



*Image 4: Still image from Exhibit 5 showing Borgerding unhooking the bike rack barricades on the East Front of the Capitol*

After breaking through the barricades, Borgerding charged towards the Capitol, along with hundreds of other rioters. As shown in Exhibit 6, rioters rushed towards the officers standing near or on the Rotunda Steps as they attempted to retreat towards the Capitol building and form a line. *See* Exhibit 6 at 0:38 to 1:55.

At this point, Borgerding encountered a chain link fence and a line of officers on the

Rotunda Steps, as shown in Image 5 below. Rioters directly in front of Borgerding yelled at officers attempting to hold the line. Simultaneously, rioters to Borgerding's right shoved officers in an attempt to push through the police line. Image 5 shows those rioters, positioned to the right of Borgerding, as they pushed against officers. Rioters near Borgerding cheered those rioters on.



*Image 5: Still image from Exhibit 8 at 19:03, showing melee between rioters and police officers at the base of the Rotunda Steps*

Other rioters near Borgerding also stood on police vehicles, as shown in Image 6. Borgerding and the other rioters eventually overwhelmed the officers on the Rotunda Steps, forcing them to retreat up the steps.

9



*Image 6: Still image from Exhibit 9 at 0:50, showing rioters battling with police officers near the base of the Rotunda Steps, with Borgerding's Q sign visible*

Borgerding walked directly past the post on the Rotunda Steps, to which the chain link fence was attached just seconds before.

Borgerding then approached the Rotunda Doors, where a mob of rioters swarmed the few officers guarding those doors. Alarms blared in the background as rioters yelled, among other things, "our house." *See, e.g.*, Exhibits 7 and 8. Multiple rioters near Borgerding wore military-style gear, as shown in Image 7. Police officers deployed a "flash bang" grenade against the rioters, to little avail. Evidence at trial demonstrated that the flash bang was audible from where

Borgerding stood. Borgerding entered the building through those doors at approximately 2:43 p.m.



*Image 7: Still image from Exhibit 7 at 2:17, showing Borgerding's Q sign as she moved towards the Rotunda Doors*

After entering the building, Borgerding headed straight to the Rotunda. The alarms continued to sound. She remained in the Rotunda for approximately ten minutes. After leaving, she went down a set of steps to the first floor. She walked west towards the Senate Wing Doors. As Borgerding neared the Senate Wing Doors, alarms also blared. At approximately 2:54 p.m., Borgerding exited the building through a window that rioters had previously smashed open. After exiting the building, she remained in the Northwest Courtyard on Capitol grounds for at least 23 additional minutes. At this point, Borgerding had been on Capitol grounds for over eight hours, and within restricted Capitol grounds for nearly an hour and a half.

### C.    Borgerding's Statements

The United States obtained search warrants for Borgerding's cell phone and a Facebook account belonging to her codefendant, Walter Messer. FBI agents also interviewed Borgerding after her arrest. This interview and seized materials revealed that Borgerding appeared to subscribe to the "QAnon" conspiracy theory, that she planned to travel to Washington, D.C. for the January 6 event, and that in the days and months following January 6, she had no remorse for the events that occurred or her part in those events.

### *Pre-January 6 Facebook Communications*

Borgerding and Messer communicated frequently on Facebook, including in the days leading up to January 6. For example, on December 30, 2020, Borgerding sent a private message to Messer, acknowledging she was aware of the certification process. In the message, Borgerding advocated that legal action be taken against Mike Pence and "MOST of Congress and Senators," specifically stating that it would be "EPIC & WILD" if such people were arrested by the military.

**Author** Therese Maurer Borgerding (Facebook: 100009539724761)
  **Sent** 2020-12-30 18:14:41 UTC
  **Body** I was thinking why does PRESIDENT trump want so many people there at DC. I Know it's important BUT WHAT  IF the military goes in and arrested
 Mike Pence
MOST of Congress   and Senators. Put them in SHACKLES and parade them in front of us at the Capitol building as they go to GITMO. !!!!!!!
Now that would be EPIC & WILD

*Image 8: Borgerding's December 30, 2020 Facebook message urging the imprisonment of*
*United States Senators and Members of Congress*

Borgerding expressed similar statements towards "liberals" in general, including a desire that

"liberals get pounded to the ground by the military":



| | |
|---|---|
| **Author** | Therese Maurer Borgerding (Facebook: 100009539724761) |
| **Sent** | 2020-12-10 00:19:41 UTC |
| **Body** | Well its gonna be fin watching these liberals get pounded to the ground by the military cause they can do anything they want now. |
| **Author** | Therese Maurer Borgerding (Facebook: 100009539724761) |
| **Sent** | 2020-12-10 00:19:47 UTC |
| **Body** | Fun |
| **Author** | Therese Maurer Borgerding (Facebook: 100009539724761) |
| **Sent** | 2020-12-10 00:20:25 UTC |
| **Body** | The military can put the hammer down in them things with NO PITY |
| **Author** | Therese Maurer Borgerding (Facebook: 100009539724761) |
| **Sent** | 2020-12-10 00:20:34 UTC |
| **Body** | Thugs |

*Image 9: Borgerding's December 10, 2020 Facebook message urging that the United States military "pound[]" "these liberals"*

### Post-January 6 Social Media Communications

Borgerding also made several comments on social media after January 6, 2021 acknowledging and boasting about her conduct, while simultaneously denying the reality of what happened. For instance, on January 6, 2021 at approximately 4:16 p.m., Messer posted a status on Facebook stating, "the capital just got stormed." On January 7, 2021, in response, Borgerding commented, "We have lots of videos!!" The next day, on January 8, 2021, Borgerding commented on the below picture posted by Messer, "What a great day and we were there!!!!!!"



*Image 10: Image of the January 6 riot that Messer posted on Facebook*

Borgerding further announced her presence in several other images posted on Facebook. For example, on January 7, 2021, she commented on Image 11, showing Borgerding in front of a group of Proud Boys gathered on the East Front, "Hey there I am AGAIN!!!! 'Q'".



*Image 11: Image of Borgerding with a contingent of Proud Boys on the East side of the United States Capitol building with her Q sign*

Borgerding described the events of the day as "peaceful," and falsely claimed that the

police "held the door" for her "to get inside." *See* Image 12, below. Evidence a trial, including video footage presented and the testimony and of Officer Marc Carrion and Lieutenant Van Benschoten, proved Borgerding's claims to be untrue. *See, e.g. United States v.* Borgerding, No. 21-00631, Day 4 – Morning Session, Trial Transcript (April 25, 2024) at 100:12-13 (Officer Carrion describing January 6 as unique based on "the sheer number of violent incidences and just the breach of the Capitol.")

| | |
|---|---|
| **User** | Therese Maurer Borgerding (100009539724761) |
| **Text** | I saw a police officier put his hat backwards said I'm with you guys I voted for Trump too. The police officer said I understand how you feel and gave this guy his megaphone to  use... it was Very peaceful the police were nice even held the door for me to get inside |

*Image 12: Borgerding's Facebook post dated January 7, 2021 regarding her alleged interaction with a police officer on January 6, 2021*

On January 9, 2021, in another comment on Facebook, Borgerding described January 6, 2021 as "a BLAST":



| Comments | | |
|---|---|---|
| | **User** | Therese Maurer Borgerding (100009539724761) |
| | **Text** | That DAY was a BLAST!! 😂😂😂😂😂😂😂 |
| | **Time** | 2021-01-09 03:22:24 UTC |

*Image 13: Borgerding's Facebook comment dated January 9, 2021 on a photograph showing rioters storming the Rotunda Doors, describing January 6 as a "blast"*

The next day, on January 10, 2021, in a comment on one of Messer's posts on Facebook, Borgerding again made clear that she did not regret her participation in the events of January 6. In fact, Borgerding stated that she was "SO PROUD" of her involvement in the riot, which she described as "all Fake," mocking those who believed what happened on January 6 was reality.

She wrote:

**User** Therese Maurer Borgerding (100009539724761)
**Text** This was a MILITARY STING OPERATION!!! The FAKE ANTIFA were
MILITARY SPECIAL FORCES.!!!!  No one got shot No one died. FAKE
NEWS you insist in believing in. They set YOU UP!!!!!! We were part
of a MILITARY STING OPERATION !!!! I AM SO PROUD I STOOD UP
FOR AMERICA AND FOR OUR COUNTRYS FREEDOM. Yes I was in the
building for a long time too. There was NO RIOTING FAKE NEWS
AGAIN.  In the coming days you will be seeing HUGE THINGS!!!!!!!
It's all good for the Patriots
**Time** 2021-01-10 15:20:50 UTC

*Image 14: Borgerding's January 10, 2021 Facebook post, stating that the January 6 riot
was a "sting operation"*

On January 27, 2021, Borgerding and Messer exchanged additional messages about the

January 6 riot, in which Borgerding described them as "WARRIORS," as shown below.

**Author** Walt Messer (Facebook: 100016499853552)
**Sent** 2021-01-11 17:17:54 UTC
**Body** i think that scared people  at the capital

**Author** Walt Messer (Facebook: 100016499853552)
**Sent** 2021-01-11 17:18:40 UTC
**Body** people watching it on tv got scared

**Author** Therese Maurer Borgerding (Facebook: 100009539724761)
**Sent** 2021-01-11 17:52:33 UTC
**Body** Big babies!!!!!

**Author** Therese Maurer Borgerding (Facebook: 100009539724761)
**Sent** 2021-01-11 17:52:46 UTC
**Body** We are WARRIORS

**Author** Walt Messer (Facebook: 100016499853552)
**Sent** 2021-01-11 17:52:53 UTC
**Body** yup

*Image 15: January 11, 2021 Facebook messages between Borgerding and Messer*

In May 2021, Borgerding created a Twitter account using the handle "Q Warrior." On

July 9 of that year, she tweeted the following:



*Image 16: Borgerding's July 9, 2021 tweet, stating: "Jan 6th I would do it again"*

### *Borgerding's FBI Interview*

FBI agents interviewed Borgerding on July 28, 2021. During that interview, she concealed her actions on, and downplayed the events of January 6. The government has submitted to the Court a video recording of that interview as Exhibit 4 for sentencing.

For instance, Borgerding minimized how rioters attacked police on January 6 and misled the FBI agents about officers' actions on that day. Borgerding insisted that "the police said, 'come on in,'" allowing rioters to enter the building. Exhibit 4 at 18:01. She told the agents that officers at the Rotunda Doors "were letting people in" and "there were some people who would come out, then they'd let some more in." *Id.* at 29:52. She further stated that it was "really odd," because there were "hardly any" police at the Capitol on January 6, and that the officers "had their hands in their pockets." *Id.* at 18:09, 22:23. She insisted that "these cops…were really nonchalant, like they were at the rally or something." *Id.* at 18:30.

Those statements were all flatly untrue. While the officers were severely outnumbered by the rioters, Borgerding saw dozens of officers as she stood on the East Front behind the barricades, contrary to her assertions that there were "hardly any" officers in her vicinity, as shown in Image 17 below.



*Image 17: Still image of dozens of police officers guarding the East Front of the U.S. Capitol on January 6 with Borgerding circled in yellow*

The video footage from January 6 further disproves Borgerding's claims. That footage shows officers scrambling towards the Capitol building as a large mob of rioters attempt to overtake them, *see, e.g.*, Exhibit 6 at 0:38 to 1:35, struggling with rioters over the barricades, *see, e.g.*, *id.* from beginning to 0:38, and attempting to keep the doors of the Rotunda closed, despite aggression from the mob of rioters. *See* Exhibit 8 beginning at about 37:06. The testimony of USCP Lieutenant Van Benschoten and Officer Carrion at trial further demonstrated that officers on the East Front of the Capitol building strove to keep rioters from entering restricted Capitol grounds and the Capitol building at every turn, despite being vastly outnumbered by an angry mob and fearing for their own safety. Officer Carrion explained, for instance, that he and his fellow officers were "just getting pummeled by the crowd" surrounding the Rotunda Doors, and that "[a]t some point, it dwindled down" to just himself and one other officer, and that they were "just trying

[their] best to stop people from [entering] the Capitol[.]" *United States v. Borgerding*, No. 21-631, Day 4 – Morning Session, Trial Transcript (April 25, 2024) at 53:3 to 54:8.

Borgerding also described to the agents the moments when the rioters to her right began pushing against the bike rack barricades. Instead of acknowledging the reality of what happened, Borgerding called the scene "fake" and insisted that "it wasn't real." Exhibit 4 at 18:59, 19:54. And although she acknowledged that "there were people there who were being extra, super rowdy," she insisted that she "still never saw anybody hurt anything." *Id.* at 19:09. Further, she described to the FBI the point at which she unhooked the bike racks on the East Front, but minimized her conduct, stating that she "moved [the bike rack] over," so that it was no longer in her way, "and then it opened up." *Id.* at 21:14. In reality, and as described above, Borgerding lifted up the bike racks in front of her and unhooked them so that she and others could rush towards the building. *See* Exhibit 5.

As she admitted, Borgerding also encountered another line of officers on the Rotunda Steps. But Borgerding told the agents that the police on the steps "took the chain…off of there, and put it to the side so that everybody could go up the steps." Exhibit 4 at 22:57. The evidence again proves this statement was false. As presented at trial, officers on those steps strove to hold a line and keep rioters from moving towards the building. *See* Exhibit 6 beginning at approximately 1:52; Exhibit 8 at approximately 13:26 to 19:40. From where Borgerding was standing, she would have seen the rioters immediately in front of her push forward, overwhelming those officers. Rioters around Borgerding also cheered as the mob violently pushed the line of officers to her right.

Despite her many false statements to the FBI agents, Borgerding nonetheless defended her conduct. She said she "was going in there," to "stop socialism, communism, and to speak for these children, to save our Constitution that's been trampled on for lots of years." Exhibit 4 at 39:35 to 40:00. She stated, "you have to take things in your own hands a little bit" and that she was doing it for "the people that are too scared to do anything" and because "people weren't happy we got our election stolen from us!" *Id*. at 40:30 to 40:59. At no point did Borgerding express remorse or regret for her conduct or the events of January 6.

Borgerding's statements—both during her interview with the FBI and on Facebook—demonstrate that she was proud of her conduct, not only in the days after January 6, but even after months had passed. Her lack of remorse, in conjunction with her adherence to QAnon conspiracy theories, indicates a willingness to commit similar crimes again.

### *Borgerding's Post-Trial Filing*

Borgerding refused to accept the jury's guilty verdicts. Following trial, on June 6, 2024, Borgerding sent a document to the Court further underscoring her lack of remorse. In this document, titled "Evidence of Mistrial and Duty to Dismiss," she stated, among other things, that "all witnesses" who testified at trial "shall not be considered a witness in this tr[ia]l" and that there "have been NO claims that I caused harm, damage or fraud to anyone, or damaged any property." Exhibit 10 at 1.

The government interprets this document, in light of Borgerding's prior submission to the Court on or about December 15, 2023, *see* Exhibit 11, to be an effort by Borgerding to advance sovereign citizen arguments or claims. The "sovereign citizen" movement is "a large anti-

government extremist movement whose adherents believe the government is the illegitimate product of a conspiracy that subverted the original, lawful government."[4] Followers of that movement "claim people can take steps to divorce themselves from the illegitimate government, after which it has no authority or jurisdiction over then."[5] Borgerding's document, together with her conduct on January 6 and statements thereafter, demonstrates a lack of remorse and a risk of recidivism.

## III.    THE CHARGES

On December 13, 2023, a federal grand jury returned a superseding indictment charging Borgerding with five counts under 18 U.S.C. § 231(a)(3) and (2), 18 U.S.C. §§ 1752(a)(1) and (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). On, April 26, 2024, at the conclusion of a trial, the jury convicted Borgerding on all counts.

## IV.    STATUTORY PENALTIES

Borgerding faces up to five years' imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, a term of up to five years of probation, and a mandatory special assessment of $100 on Count One. For Counts Two and Three, she faces a term of imprisonment of up to one year, a term of supervised release of one year, up to five years' probation, a fine of up to $100,000 and a mandatory special assessment of $25 for each count. For

---

[4] "The Sovereign Citizen Movement in the United States," Anti-Defamation League, available at https://www.adl.org/resources/backgrounder/sovereign-citizen-movement-united-states?gad_source=1&gclid=Cj0KCQjw2ou2BhCCARIsANAwM2GbgQ1rOWmcevivlAQnZCvphGfTRI86G6F074nkiqLN2ZabuF4RQacaAhLrEALw_wcB&gclsrc=aw.ds (last visited August 22, 2024).
[5] *Id.*

Counts Four and Five, she faces a maximum term of imprisonment of up to six months, a term of probation of up to five years, a fine of up to $5,000 and a special assessment of $10 for each conviction.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government largely agrees with the Probation Office's Guidelines calculations, which are as follows:

Group 1 (Count 1): Civil Disorder and Aiding and Abetting

| | |
|---|---|
| **Base Offense Level:** | **10** |
| **Specific Offense Characteristics:** | **0** |
| **Victim Related Adjustment:** | **0** |
| **Adjustment for Role in the Offense:** | **0** |
| **Adjustment for Obstruction of Justice:** | **0** |
| **Adjusted Offense Level (Subtotal):** | **10** |

Group 2 (Counts 2 and 3): Entering or Remaining in a Restricted Building or Grounds and Disorderly and Disruptive Conduct in a Restricted Building or Ground

| | |
|---|---|
| **Base Offense Level:** | **10** |
| **Specific Offense Characteristics:** | **0** |
| **Victim Related Adjustment:** | **0** |
| **Adjustment for Role in the Offense:** | **0** |
| **Adjustment for Obstruction of Justice:** | **0** |
| **Adjusted Offense Level (Subtotal):** | **10** |

**Multiple Count Adjustment:** Units are assigned pursuant to USSG §3D1.4(a), (b) and (c). One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious. One-half unit is assigned to any group that is 5 to 8 levels less serious than

23

the highest offense level. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

| Group/Count | Adjusted Offense Level | Units |
|-------------|:----------------------:|:-----:|
| Group 1 | 10 | 1.0 |
| Group 2 | 10 | 1.0 |

**Total Number of Units:** 2.0

**Greater of the Adjusted Offense Levels:**          **10**

**Increase in Offense Level:** The offense level is increased pursuant to the number of units assigned by the amount indicated in the table at USSG §3D1.4.                    **+2**

**Combined Adjusted Offense Level:** The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at USSG §3D1.4.
                    **12**

**Acceptance of Responsibility:** As of completion of the presentence investigation, the defendant has not clearly demonstrated acceptance of responsibility for the offense. USSG §3E1.1.   **0**

**Chapter Four Enhancement:** The defendant meets the criteria at USSG §§4C1.1(a)(1)-(10). Therefore, the defendant is a Zero-Point Offender, and the offense level is reduced by two levels. USSG §§4C1.1(a) and (b).                    **-2**

**Total Offense Level:**                    **10**

The PSR includes one material error. Without further analysis, the PSR contemplates a two-level decrease under USSG § 4C1.1(a)(3). As described in more detail below, Section 4C1.1 is inapplicable. The government agrees with the rest of the Guidelines analysis set forth in the PSR.

Under a totality of the circumstances, Borgerding's actions on January 6, 2021 constituted

"credible threats of violence" under § 4C1.1(a)(3), rendering her ineligible for the two-point reduction under § 4C1.1. As described in the Government's Objections to the PSR, ECF No. 135, and this memorandum, Borgerding unhooked two metal barricades on the East Front of the Capitol building, rushed towards the building along with hundreds of other people, and then pushed her way into the building through the Rotunda Doors. Borgerding remained on the East Front of the Capitol all morning on January 6, during which time she witnessed the crowd become larger and more irritable. At the time that she unhooked the barricades, rioters just to her right had, just a few seconds prior, pushed against the police as they attempted to hold a line. Then, as she ran towards the police on the Rotunda Steps, the rioters around her became more energized and increasingly violent. Rioters just to the right of where she stood near the bottom of the Rotunda Steps again shoved against officers before breaking through the police line. *See* Image 5. As this happened, rioters in Borgerding's immediate vicinity cheered them on. Borgerding then pushed her way up the steps, where she joined a tightly-packed mob of people attempting to push their way into the Rotunda. At this point, as Officer Carrion described at trial, only a few officers remained at that doorway, and Borgerding could see that they were outnumbered. Rioters in Borgerding's vicinity yelled at those officers, some while wearing tactical gear. Borgerding and the other rioters entered the building as a mob in a surge, simultaneously pushing with their weight towards the door and the few remaining officers.

The officers on the East Front of the Capitol at this time, and in particular the officers guarding the Rotunda Doors, were severely outnumbered by a large group of angry rioters. Further, by the time that they reached the Rotunda Steps and then Rotunda Doors, rioters on the East

Front—and elsewhere on Capitol grounds—had already proven their willingness to use force and physical violence against officers to get into the building. A reasonable officer facing the crowd of rioters would thus perceive any one of their actions as threatening of violence. *See, e.g. United States v. Secor*, Case No. 1:21-cr-00157 (TNM), Memorandum Order, Docket No. 63 (July 12, 2024) (defendant who "joined a mob of two dozen others" at the Rotunda Doors was not eligible for the § 4C1.1 reduction where the officers were "vastly outnumbered" and "had their backs to the wall" as the defendant and others "pushed themselves forward, throwing their weight against the officers and doors.").  And when Borgerding joined this part of the mob, in that time, under those circumstances, she joined in threatening violence against the officers.

To the extent the Court does not agree that § 4C1.1(a)(3) is inapplicable in this case, the Court should nonetheless vary upward by two levels to account for the reduction under 4C1.1. An upward variance is warranted because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part

26

caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Borgerding's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream."). Here, as described above, Borgerding has expressed that she is proud, not remorseful, of her actions of on January 6. There has been no indication that she has had any changes in the beliefs or feelings that motivated those actions.

The U.S. Probation Office calculated Borgerding's criminal history as category I, which the government does not dispute. PSR ¶ 56. Accordingly, based on the government's calculation

of Borgerding's total adjusted offense level of 12, Borgerding's Guidelines imprisonment range is 10 to 16 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a substantial term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Borgerding's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Borgerding took an active part in this violent mob. By unhooking the metal barricades on the East Front of the Capitol, she facilitated the breach of the Rotunda Doors. What's more, when interviewed by the FBI, Borgerding lied to agents, claiming she was waved in by police officers at various points, blaming the very people who put their lives on the line that day. The nature and circumstances of Borgerding's offenses were serious, and fully support the government's recommended sentence of 13 months' incarceration.

### B.     Borgerding's History and Characteristics

As set forth in the PSR, Borgerding is a 61-year-old resident of Ohio. PSR ¶ 78. She reported a happy childhood, free from poverty, abuse, or neglect. *Id.* at ¶ 89. She has two adult children with whom she has good relationships. *Id.* at ¶¶ 91-92. Despite previous health issues and other difficulties in prior relationships, defendant reported a stable home life. Defendant's husband, Richard, traveled with her to the U.S. Capitol on January 6 but did not enter the U.S.

Capitol building. Borgerding has no criminal history.

Borgerding has not demonstrated that her family is reliant upon her for care. Although her husband claims to be dependent on her, *id.* at ¶ 94, it is not clear why. Richard Borgerding sat through the entirety of the trial and appeared mentally and physically capable. He also traveled to Washington, D.C. with Borgerding and attended the events on January 6 (including standing for close to eight hours amid a riot), without apparent physical difficulty. Further, Borgerding's children are grown and no longer reside with her, and Borgerding's parents, for whom she previously cared for, are now deceased. Moreover, Borgerding has a large family—including eight siblings, all of whom live in Ohio—who may be able to assist with any of her obligations should she be incarcerated, including any necessary care of her husband.

Further, at the age of 61, and with a high school education, Borgerding clearly knew better than to break into the U.S. Capitol building.

Borgerding is also a staunch supporter of a right-wing conspiracy theory called "QAnon." *See* footnote 2. While Borgerding, like all Americans, has the right to her own beliefs, in this case those beliefs directly contributed to her criminal actions on January 6th. Borgerding will continue to pose some risk of recidivism as long as she believes that criminal actions are justified in support of her beliefs.

Overall, Borgerding's history and characteristics support a sentence in the middle of the Guidelines range.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Even though Borgerding did not personally commit any acts of violence on January 6, her conduct on January 6 represents the epitome of disrespect for the law. Her subsequent misrepresentations to FBI agents about what occurred that day, her boasting on social media about her participation in the riot, and her continued claims that the police let her into the Capitol all indicate that Borgerding has little respect for the law and support a sentence in the middle of the Guidelines range.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Borgerding has expressed no remorse for her actions on January 6. In fact, in the days

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

following January 6, Borgerding described herself as a "WARRIOR" and stated that she was "proud" of her behavior. *See* Image 14. Further, Borgerding refused to accept the reality of what happened—calling the events at the Capitol on January 6, "fake." *Id.*; Exhibit 4 at 18:59; *see also id.* at 19:54 (stating that what she saw on January 6 "wasn't real"). There has been no evidence that Borgerding has since reconsidered or changed her views on what happened on January 6, nor that she has accepted the jury's verdict against her as legitimate. The need for specific deterrence could not be more clear.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

**F.      Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases, *United States v. Cooke* and *United States v. Mostofsky*, provide suitable comparisons to the relevant sentencing considerations in this case.

First, like Borgerding, Nolan Cooke helped lead the charge of rioters who broke through the police line guarding the East side of the Capitol building. *See United States v. Cooke*, No. 1:22-cr-52 (RCL), ECF No. 48 at ¶ 10. Also like Borgerding, Cooke later bragged about his actions on January 6, and specifically that he was one of the first to break through the barricade. *Cooke*, ECF No. 52, at 2, 39. Cooke encouraged other rioters to overrun the police line, yelling obscenities along the way. *Id.* at ¶ 10. Once the rioters had broken through the barricade, Cooke rushed to the

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Capitol steps and then up to the building itself, just as Borgerding did. *Id.* at ¶ 11. Cooke used a flagpole bearing an American flag to strike one of the Capitol windows and encouraged other rioters to "smash the windows" and "break the glass." *Id.* Cooke eventually left the restricted area without entering the building. *Id.* at ¶ 12. Borgerding, on the other hand, remained in the Capitol building for approximately ten minutes, and on restricted Capitol grounds for over twenty minutes after that. Further, Cooke was cooperative with law enforcement officers when they interviewed him after January 6, *id.* at ¶ 14, whereas Borgerding repeatedly misled investigators. Judge Lamberth sentenced Cooke to a year and a day of imprisonment, in the middle of Cooke's 8-14 month Guidelines range. *Id.*, ECF No. 60. Borgerding's Guidelines range (10-16 months) is even higher.

In *United States v. Mostofsky*, the defendant, dressed as a caveman and carrying a walking stick or rod, was among the first to breach the restricted area around the Capitol. No. 21-cr-138 (JEB), ECF No. 100 at 2. Just as Borgerding did when she unhooked the barricades on the East front, Mostofsky obstructed officers attempting to guard the barriers around the Capitol building. Specifically, Mostofosky forcibly pushed against officers who were attempting to adjust barriers in the West Terrace area to keep rioters from entering the Capitol building. After impeding officers, Mostofsky joined the crowd breaking into the building itself and was in the first group of rioters to breach the Capitol building. Mostofsky stole protective gear, a Capitol Police bullet-proof vest and a riot shield. He pled guilty to Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Theft of Government Property, in violation of 18 U.S.C. § 641; and Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1). Then Judge (now Chief

Judge) Boasberg determined the applicable Guideline range to be 10-16 months and sentenced Mostofsky to 8 months' imprisonment and 200 hours of community service. Judge Boasberg appeared to have given substantial weight to numerous letters he received in support of Mostofsky; Mostofsky's good works and active community service; and Mostofsky's personal circumstances, including an alleged untreated neurological condition. Unlike in Mostofky's case, those factors are not mitigating here: Borgerding has no such conditions, she has not demonstrated that she is active in her community, nor did she accept responsibility by entering into a plea agreement with the government.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has

suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Borgerding was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full

restitution without respect to a defendant's ability to pay.[9]

Because Borgerding in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and her criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Borgerding responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Borgerding to pay $2,000 in restitution for her convictions on Counts 1 through 5 of the Indictment. This amount fairly reflects Borgerding's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

Borgerding was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

**VIII.    FINE**

Borgerding's convictions for violations of 18 U.S.C. § 231(a)(3) and 2, 18 U.S.C. §§ 1752(a)(1) and (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G) subject her to a statutory maximum fine of up to $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Borgerding's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The Sentencing Guidelines require a fine in all cases, except where Borgerding establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Borgerding's financial assets set forth in the PSR suggest that she is unable, and is unlikely to become able, to pay a fine. Specifically, the PSR indicates that Borgerding is unemployed and that her only source of income is her husband's disability income.

**IX.    CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 13 months' incarceration, two years' supervised release, $2,000 in restitution, and the mandatory special assessment of $170.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

38

BY:     */s/ Kaitlin Klamann*_____
        KAITLIN KLAMANN
        Assistant United States Attorney
        Illinois Bar No. 6316768
        601 D Street NW
        Washington, D.C. 20530
        (202) 252-6778
        Kaitlin.Klamann@usdoj.gov

        */s/ Rachel Freeh*_____
        RACHEL FREEH
        Assistant United States Attorney
        District of Columbia Bar No. 1736082
        601 D Street NW
        Washington, D.C. 20530
        (202) 252-7749
        Rachel.freeh@usdoj.gov