**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **United States of America** | * | |
| | * | |
| **v.** | * | **Case No. 21-cr-0631-2 (TJK)** |
| | * | |
| **Therese Borgerding** | * | |
| | * | |

**SENTENCING MEMORANDUM**

Mrs. Borgerding is a 61 year-old mother and grandmother who has worked all her life to raise her family.  Until the instant offense, she has lived a law-abiding life.  Every person who knows her describes her as a kind, compassionate and a "very caring and loving human being."[1]  On January 6, she was peaceful and remained in the Capitol for only 10 minutes.  While she was present with many others on that day, she mostly kept to herself.  She did not participate in any violence, did not destroy any property and did not have any personal interactions or confrontations with any law enforcement officer at any time, including while entering or exiting the building.  For the more than three years since she has been on pretrial release, she has been in perfect compliance with the conditions established by the Court.

Based on all of the facts and circumstances, Mrs. Borgerding respectfully requests that the Court impose a sentence that does not include imprisonment.  Such a sentence is "sufficient, but not greater than necessary" to promote the purposes of sentencing as required by 18 U.S.C. § 3553(a).  It is also the sentence recommended by the Probation Officer and the "appropriate sentence" under the Sentencing Guidelines and the statutory mandate set out in 18 U.S.C. § 994(j).  A sentence that does not include a term of imprisonment takes into account the mitigating circumstances present in

---

[1]  The information set out herein is based on the Presentence Report and letters to be submitted to the Court.

the case and avoids unwarranted disparity as required by 18 U.S.C. § 3553(a)(6). And, a sentence of "probation, rather than "an act of leniency," is a "substantial restriction of freedom." *Gall v. United States*, 552 U.S. 38, 44 (2007).[2]

Although various grounds for downward departure and variance are set out below, Ms. Borgerding has no objections to the Guidelines calculations set out in the Presentence Report ("PSR"). With a total offense level of 10 and criminal history I, her sentencing range is 6 to 12 months. As noted in the PSR and as recommended by the Probation Officer, for a defendant like Mrs. Borgerding with no prior criminal history, whose advisory range is in Zone B "a sentence other than a sentence of imprisonment" is appropriate. USSG §5C1.1, comment. (n.10). *See also* 28 U.S.C. § 994(j) ("The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense"). While the government argues otherwise, the total offense level as calculated under the guidelines is the best indicator that an offense is not a "serious offense."

For all these reasons and in consideration of the mitigating circumstances present in the case, which include her age, health, her caretaking responsibilities to her husband who is a disabled combat veteran, her life-long history of doing good works, and the fact that she was peaceful on January 6,

---

[2] We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. "Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court. *Gall*, 552 U.S. at 48 (internal citations omitted)

a sentence that does not include imprisonment is "sufficient, but not greater than necessary" as required by 18 U.S.C. § 3553(a). That sentence results in just punishment and avoids unwarranted disparity.

## ARGUMENT

### I.    Legal Standard

In enacting the Sentencing Reform Act, Congress enshrined a "parsimony principle" in 18 U.S.C. § 3553(a) that requires federal courts to impose the least amount of imprisonment necessary to accomplish the four purposes of sentencing – just punishment, deterrence, protection of the public and rehabilitation. *Holguin-Hernandez v. United States*, 589 U.S. 169, 174-75 (2020); *Dean v. United States*, 581 U.S. 62, 67 (2017); *Pepper* v. *United States,* 562 U.S. 476, 491 (2011). A sentence that is "greater than necessary" is substantively unreasonable. *Holguin-Hernandez, supra*.

Under 18 U.S.C. § 3553(a)(1) - (a)(6), in selecting the sentence, the Court must consider:

- the nature and circumstances of the offense;

- the history and characteristics of the defendant;

- the guidelines and the kinds of sentences available; and

- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### II.   A Sentence That Does Not Include Imprisonment is Sufficient, But Not Greater Than Necessary, to Comply with 18 U.S.C. §3553(a)

#### A.    Therese Borgerding's Life-long Law Abiding History, Hard Work and Concern for Others Reflect That Prison Is Unnecessary in this Case

Mrs. Borgerding is a life-long resident of Ohio, the middle child of nine children in a working class family. Her father worked building bridges. Her mother was a homemaker. The large family

lived a simple life; they enjoyed camping, gardening and praying.  To this day, the front of her home is full of lush flowers and plants.  She is the mother of two children, step mother to another child and the grandmother of 3 grandchildren, whom she describes as "adorable."  This is her first criminal conviction.

Both her parents have passed away during the pendency of this case.  Her mother died at 88 years old in 2023.  Her father died a few weeks ago, at 91 years old.  Characteristically for Mrs. Borgerding, although she has eight siblings, it was Therese who took care of her parents to the end. In their last years, she bathed them, fed them, took care of their hygiene and all their needs so they could die peacefully in their own home. As her sister details:

> Therese is a most loving sincere person I have lived with during our years growing up. She is one of nine siblings in our family and grew up with a hard working Father and Mother. We were brought up in the Catholic faith and went to church almost every day, our lives were happy and very loved by our parents who instilled perseverance to respect others no matter their faith, race or wealth also [to be] hard working and helping others in need.

> Therese is caring and loved by anyone who met her always helping others, she stayed at our parent's house 24/7 to help out when our mother had cancer and was on Hospice. Also stayed with our father of age 91 helping 24/7 with his care at home after a decline in his health he recently passed in July of 2024. Both our parents passed within 15 months. I sincerely believe if it wasn't for her help they could not have lived a happy life during their later years as they would have been in a nursing home. Therese also helps our younger brother who has mental delays and needs some direction and we are very fortunate to have her help with this as well.

Letter from Kathleen Gaier.

Her life has not been easy.  She has worked all her life until she was diagnosed with cancer a few years ago.  As a single parent for much of her children's life, sometimes she held down two

jobs to make ends meet.  During one period, she worked as a housekeeper at a nursing home during the day and as a janitor in the evenings.  During high school, she obtained a cosmetology license and later a cosmetology manager's license and worked in that profession many years.

Her first husband was abusive – physically, mentally and sexually.  They were married for 16 years and had two children.  As a result of his abuse, she sought counseling from church peers and a psychiatrist. They divorced in 2000.  After the divorce, she raised and supported her two children through her hard work.

### 1.    Combination of Mitigating Factors Warrant Downward Variance

Ms.  Borgerding also suffers from depression, for which she first sought treatment in 1984 during the abusive relationship with her former husband.  PSR at ¶¶ 103-104; Letter from Richard Mauer, Therese's brother (detailing family history of depression), attached as an exhibit.

Ms.  Borgerding's age, her recent bout with cancer, her history of gainful employment and good works, and depression alone and in combination warrant a sentence below the range.  *See* U.S.S.G.  §  5K2.0(c)  (combination  of  two  or  more  offender  characteristics  may  warrant  a downward departure); 5H1.1 (age); 5H1.3 (emotional conditions); 5H1.4 (medical conditions); 5H1.5 (employment record); 5H1.11 (good works); *United States v. Gomez,*  431 F.3d 818, 825 (D.C. Cir. 2005)(reversing and remanding based on district court's too-strict a reading of its post-Booker authority to sentence below the guidelines in case where defendant pointed to  strong employment history, no criminal history before or after the offenses of which she was convicted, emotional issues, and medical issues).

## 2.      Caretaking Responsibilities Warrant a Sentence that Does Not Include Imprisonment

Therese Borgerding has been married to a wonderful man, Richard Borgerding since 2014. He is a retired combat veteran, who is 100% service-disabled. At present, their main source of income is his retirement and disability benefits.  Mr. Borgerding's letter describes Therese's loving nature and kindness.  He also describes the indispensable care she has provided to a number of family members.  In particular, he describes the help she is to him when his injuries become disabling, a factor that the Court may consider in determining the sentence to impose:

> Your honor, I am writing about my wife Therese Borgerding. Therese means everything to me, not only because she's my wife, but because she is such a wonderful person. She is a very strong Christian and always puts God first in her life. We just had our 10th wedding anniversary. God put us together 12 years ago and we've been a perfect match. Therese was working at a nursing home when we first met. The elderly residence loved her because she would take the time to talk with them. She is always so caring to everyone. When my Dad was sick, Therese took great care of him all the way up to he passed away in November, 2018.  She did a great job taking care of my Mother until she passed away February, 2021.  During all this time, Therese was also taking care of her own parents.  The amount of love she gives to others is amazing. She also helped my sister Janice who had brain cancer. Therese assisted my sister until she passed away in 2019.
> . . .
> Therese is a huge help for me. I am a 100% disabled retired veteran due to major spine injuries I received in the Persian Gulf.  She is there helping me when I am in severe pain, which is nearly daily.  During my bad times, there are weeks I have trouble doing things as my legs give out due to my spine injury, Therese is always there by my side assisting me. Therese was a big help during my neck surgery I had three years ago due to a service connected injury. I'm not sure how I can go on without her.  She is always there for me at my worst times, and my best times.[3]

---

[3] Letter attached as exhibit.

Section 5H1.6 provides that a defendant's family ties or responsibilities, though not ordinarily relevant, may be considered if the defendant's incarceration would cause a substantial, direct, and specific loss of essential caretaking to a family member.  U.S.S.G. § 5H1.6 (n.1).  However, after *Booker*, the Supreme Court has made clear that a district court may not require "extraordinary" circumstances to justify a sentence outside the Guidelines range for factors set out in Chapter 5.  *Gall v. United States*, 552 U.S. 38, 47 (2007) (affirming sentence of probation from a sentencing range of 31 to 37 months in a drug case based in part on a number of "discouraged" 5H factors that were not present to an exceptional degree); *Rita v. United States*, 551 U.S. 338, 364–65, 127 S. Ct. 2456, 2473, 168 L. Ed. 2d 203 (2007) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable,or public service are not ordinarily considered under the Guidelines. *See* United States Sentencing Commission, Guidelines Manual §§ 5H1.1–6, 11, and 12. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider.")

Thus, this Court may take Ms.  Borgerding's caretaking responsibilities to her husband into account in determining a sentence that is "sufficient, but not greater than necessary" without regard to any limitations imposed by § 5H1.6.  *See, e.g., United States v. King*, 201 F. Supp. 3d 167, 171 (D.D.C. 2016) (RMC) (granting a downward variance from 10-16 month sentencing range to "three years' probation with a condition of home detention from 7:00 p.m. to 6:00 a.m. and location monitoring because "this sentence was sufficient but not greater than necessary to fulfill the goals of sentencing" in case where defendant had had participated in a large scale scheme to defraud the United States by submitting false tax returns; her participation lasted for nearly 1-year and resulted

in $82,939.41 in fraudulent claims.  Judge Collyer varied down so the defendant could care for her young child); *see also United States v. Blackwell*, 897 F. Supp. 586, 588 (D. D.C. 1995) (granting downward departure due to defendant's "substantial responsibilities as a single mother to her six young children, one of whom needs medical care.").

Moreover, this case satisfies the factors set out in Section 5H1.6 for downward departures "based on the loss of caretaking" were defendant to be imprisoned.[4]  Were the Court to imprison Mrs. Borgerding, her husband, a 100% disabled combat veteran would be without her caretaking assistance.  As he described in his letter, her help is indispensable to him as he is "in severe pain. . . nearly daily" and "there are weeks I have trouble doing things as my legs give out due to my spine injury."

---

[4]  5H1.6, application note 1(B) provides the following considerations:

(i)    The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii)    The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.  For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii)  The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv)  The departure effectively will address the loss of caretaking or financial support.

**B.      The Non-Violent Nature of Her Offense Warrants A Sentence that Does Not Include Imprisonment**

On January 6, Therese Borgerding came to DC to participate in a peaceful political demonstration.  Her intent in coming to DC is clear by what she wore and what she did on that day. She was not wearing any protective gear – no gas mask, no flak jacket, no helmet, no goggles – as some others did.  She did not have or use any weapons – no pepper spray, no tactical gloves that could cause injury, no firearms.   She did not cover her face to hide her identify.  She was on the Capitol Grounds since early morning walking around peacefully holding her Q-sign and generally keeping to herself.  Occasionally people came up to her, greeted her, shook her hand, took photos with her.  In the morning, shortly after her arrival, she knelt with a group of people to say a prayer.

She did not engage in angry chants or hurled invectives at law enforcement.  She had no personal interactions with any law enforcement officer; she did not push, assault or even brush up against any officer.  She did not disobey any direct orders.  There simply was no evidence – videos, images, or testimony – that Mrs.  Borgerding had any direct interactions, violent or otherwise, with any officer on January 6.

The videos introduced at trial reveal that for more than 7 hours, from early morning, Mrs. Borgerding stayed in public areas on the Capitol Grounds peacefully.  When people began running toward the steps of the Capitol and the police officer who had been near her in front of the barricades left, Therese can be seen tugging at the bike rack in front of her apparently trying to unhook it.  At that precise moment, an unknown man comes along.  He is the one who moves aside the bike rack segments to Mrs.  Borgerding's immediate left.  Therese then moves a couple of steps to her left and runs toward the Capitol through the opening the man has created.  The bike rack segment directly

in front of Therese remained in place and upright;  she did not move it, knock it down, or damage it.

Others in the crowd also moved forward through the opening the man had created. As can be seen

below, at the moment Mrs. Borgerding moved past the bike racks, no police officer stood at the bike

racks directly in front of or near her.





These images are cropped from a video that was produced in discovery by the government but was not introduced at trial.  The full video will be produced to the Court as an exhibit for the sentencing hearing.

As shown by its own exhibits, the government's allegations at page 7 are not accurate. Twenty police officers were not standing "directly in front" of Mrs.  Borgerding.  Only one or two officers were directly in front of Mrs.  Borgerding at 1:41 pm as shown in Gov. Image 17.  And as time passed, more of the officers moved toward the area where the confrontation eventually took place a few minutes after Image 17. The majority of the officers were concentrated about 30 or 40 feet to

her right, where the people at the barricade were actively confronting officers. Nor is it clear what Mrs. Borgerding saw, except the many people running forward. The statement from the FBI interview that the government quotes – "there were other people shaking the gates and stuff" – does not mean that she saw the full nature and extent of the confrontation 30 or 40 feet away from where she was standing, where the demonstrators overpowered the officers. Also as noted above, Images 3 and 4 in the Gov't Sentencing Memorandum show no officers by the time Mrs. Borgerding is trying to move through the bike racks.[5] Similarly, as noted above, while Mrs. Borgerding did seem to be tinkering with the bicycle rack in front of her apparently trying to unhook it to let herself through, it was not until the unknown man comes in from her left that the segment of the bike rack was actually moved aside. Mrs. Borgerding did ***not*** move the bike rack aside. It was that man who actually *moved the bike rack and created an opening*, through which Mrs. Borgerding and others went through. Indeed, during the same FBI interview that the government quotes, Mrs. Borgerding appears to be describing her recollection of that point in time saying "then somebody opened, then the gate opened" making a swinging motion with her arm.[6]

After running towards the Capitol steps, Mrs. Borgerding then stayed on the Capitol grounds near the steps to the Capitol for some minutes. While others engaged in confrontations with officers, she did not. She finally entered the Capitol through doors that had been opened. As can be heard on the government video, before Mrs. Borgerding entered the Capitol, a man can be heard saying "they opened the doors."[7] As she entered the Capitol, no police officer stopped her, blocked her way, or

---

[5] *See* Gov Sent. Memo at 6 and 8.

[6] Gov Sent. Ex. 4, beginning at timestamp 19:20.

[7] Gov Sent. Ex. 7 at :02 to :04

commanded her to leave, nor did she push or otherwise touch a police officer as she entered.

She was in the Capitol for approximately 10 minutes, walking around by herself. She did not enter any private offices. She did not enter the House or Senate chambers. She did not steal any documents or property. She did not deface any property. While she was in the Capitol, she had no personal interaction with any police officer; no police officer asked or ordered her to leave, or even spoke directly to her. As she walked down a flight of stairs making her way out of the Capitol, the police officer at the bottom of the stairs did not speak to her or to any of the other persons who were also descending the stairs. Moments later as she reached the area with doors to the outside, she climbed out of a broken window behind a stream of people who can be seen exiting the Capitol. That appeared to be the fastest way out as the path to the open doors further ahead was congested with hundreds or thousands of people who were either still entering or otherwise congregating in the area.

The fact that Mrs.Borgerding never engaged in any personal interaction or direct confrontations with officers is clear by the evidence the government introduced at trial. The three officers who testified did not recall seeing her on January 6. Even when shown a photograph of her as they were prepped pretrial, the three testifying officers could not identify her from memory and did not recall seeing her on January 6. Indeed, the discovery discloses that although she was on the Capitol Grounds for hours, fairly distinguishable because of her large Q-sign, no officer recalled seeing her that day.

It is not accurate that Mrs. Borgerding "concealed her actions" and "downplayed the events of January 6" during her FBI interview. News reports and videos from that day support her claims.

For example, there was at least one officer "wearing a MAGA hat and talking to demonstrators."[8] At trial, the court excluded a video which the defense sought to introduce of an USCP Officer who told the crowd that he was going to try to get permission to allow them to move toward the Capitol steps.  Outside the presence of the jury, the testifying Officer identified the Officer who had made that statement to the crowd near the bike racks that would later be breached.  Although there were a handful of officers near the door when Mrs.  Borgerding entered the Capitol, none of those officers stopped or ordered her out.  When she walked down stairs while in the Capitol, the police officer at the bottom of the steps did not order her out or otherwise speak to her.  There are other videos of officers taking no action as demonstrators entered the Capitol.  And videos of Officers telling demonstrators that they could stay in the Capitol if they remained peaceful.[9]  While it is true that many USCP Officers have testified that there were times when they just let demonstrators walk in or through the Capitol because the officers were outnumbered, that was not a fact known to Mrs. Borgerding when she described what she saw.  Nor has the government shown that Mrs.  Borgerding actually observed the violent conduct that some engaged in that day.  The birds-eye view of videos that the government often plays does not prove that a short person like Mrs. Borgerding would have seen all that is shown on such videos.  She did acknowledge during her FBI interview that some people were being "extra super rowdy" that day.

The government also mischaracterizes how she described the point at the bike rack.  The entire

---

[8]  *See* "A police officer is telling his version of events during the attack on the Capitol" which features an  NPR interview with former U.S. Capitol Police Lt. Tarik Johnson about "why he put on a MAGA hat that day." https://tinyurl.com/p2u7n9e6.  Officer Johnson was demoted in rank and later resigned.   A video of Officer Johnson wearing a maga hat and having a friendly conversation with an Oath Keeper can be found embedded in this New York Post story: https://tinyurl.com/2s3hhenn

[9]  https://x.com/i/status/1633774083203796993

passage including the questions the FBI agent was putting to her and the hand motions Mrs. Borgerding was making when responding more accurately reflect her statements. In fact, her description is quite accurate. In answering the FBI questions about that incident, she said she "moved it" and then "it opened up," making hand motions as she described the scene. That is in fact what the video shows. The unknown man is the one who opened up the gab when he moved the bike rack aside. Moreover, the Court should consider that she is describing a few seconds of what took place that day, from memory of events that had taken place more than six months earlier. Her comments that it was "fake" were primarily in relation to an incident she was describing about a woman and her boyfriend.

The government's reference to Mrs. Borgerding's support for Q can play no part in her sentencing. Similarly, the government's reference to the fact that she took a photograph with the Proud Boys can play no part in her sentencing. Notwithstanding the opinions of some that both groups are conspiracy theorists or support violence, both groups are lawful entities that have not been declared an illegal entity, as a matter of law. Nor is there any evidence that Mrs. Borgerding had any association with the Proud Boys before or after January 6. Thus, the short interaction she had with some Proud Boys on that day prove nothing. The First Amendment protects her associational rights with such groups.

In the same vein, the government seeks to characterize Mrs. Borgerding's pro se filings as part of the "sovereign citizen" movement without one shred of evidence of such. In fact, Mrs. Borgerding's objections to witnesses who did not describe any interactions with her is a substantial objection, one which is enshrined in the federal rules of evidence and which the Court overruled when the defense raised it during trial. *See, e.g.,* FED. R. EVID. 602 ("A witness may testify to a matter

15

only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"). The average person rightfully believes that a trial would include testimony by witnesses with personal knowledge of the defendant's conduct on the day in question based on the witnesses' interaction with the defendant. It is rare indeed that the government chooses not to put on a single witness who interacted with the defendant, particularly given the § 231 offense, which has an element interference with an officer. While the government had the burden of proving some general conduct about the events of January 6 with respect to the civil disorder charge, its decision to have all the witnesses testify about their interactions with others or to describe what the jurors could themselves observe on the videos is rare. Indeed, the statement that the government quotes from the document that "all witnesses" who testified at trial "shall not be considered a witness" has a logical basis. Merriam-Webster defines witness as "one who has personal knowledge of something." But none of the Capitol Police officers had personal knowledge of Mrs. Borgerding's conduct. The government could have called the officer at the bottom of the stairs to testify about his interactions or lack thereof with Mrs. Borgerding. Or they could have called the more than 20 officers whom they claim stood in front of her at the bike racks. Or they could have called one of the law enforcement officers whom they claim Mrs. Borgerding "obstruct[ed], impede[d], or interfere[d] with" on January 6. 18 U.S.C. § 231 (a)(3). But it chose to proceed with overview witnesses.[10] Moreover, another statement the government criticizes is perfectly accurate. No evidence was

---

[10] *See United States v. Moore*, 651 F.3d 30, 60 (D.C. Cir. 2011), *aff'd sub nom. Smith v. United States*, 568 U.S. 106 (2013) ("Because a witness presenting an overview of the government's case-in-chief runs the serious risk of permitting the government to impermissibly "paint a picture of guilt before the evidence has been introduced," and may never be introduced, we join the circuits that have addressed the issue in condemning the practice.")

presented or has been alleged that Mrs.  Borgerding injured anyone, defrauded anyone, or damaged any property.  Those documents therefore do not show a lack or remorse nor a risk of recidivism.

While the jury found that her conduct violated the charged offenses, the jury made no specific findings that would allow a determination of what conduct they found supported the civil disorder verdict. Moreover, there is no question that the conduct prosecuted under the civil disorder felony as well as the four misdemeanors of which she stands convicted encompasses a range of conduct. Many other defendants charged under the civil disorder felony had direct interactions with officers, entered into the Speaker's office or other private offices, entered the floor of the house and handled papers, laptops and other property found within the Capitol.[11]

What is clear is that on January 6, Mrs. Borgerding did not commit any violence, destroy property, enter any private offices, deface nor take away any government property.

---

[11]   *See, e.g., United States v.  Horn*, 21-cr-00301-TJK, Gov Sen't Memo (ECF 98) at 6-9 ("Horn and other rioters surged forward towards the House Chamber door"; "As rioters continued to pound on the House Chamber door, . . . a nearby rioter told Horn that someone had been shot. Many rioters immediately scattered from the area. Horn stayed. Eventually police fired chemical irritant in the area to disperse the crowd. Only then did Horn back away from the House Chamber door and enter an adjoining room to escape the smoke-filled air"; "Horn entered Speaker of the House Nancy Pelosi's office"; "Horn climbed on the Lincoln statue and watched and recorded the melee"; "officers had started to corral rioters out of the Rotunda through the Rotunda Doors. Horn exited the Capitol building with that crowd after being inside the Capitol building for nearly an hour").  Horn was convicted after jury trial of four misdemeanors.  This Court sentenced him to 12-months probation (ECF 101).

*See, e.g., United States v.  Doolin,* 21-cr-447-CJN (ECF 263, TR 8/18/23) (Bench verdict)(ECF 263) at 13-18 (Doolin stole a riot shield, "repeatedly battled against police lines and tried to enter the Capitol via the tunnel"; violated § 231 when he "used a riot shield in his attempt to push against the police line . . .at the 'tunnel').

C.      **The Appropriate Sentence Under the Guidelines is Probation.**

For purposes of the upcoming sentencing, Mrs. Borgerding does not dispute the guideline calculation set out in the Presentence Report.[12]

> Total Offense Level is 10.
> Criminal History Category is I.
> The Sentencing Range is 6 to 12 months in Zone B, before any variances or departures.

The guidelines provide that for a defendant in Zone B "a sentence other than a sentence of imprisonment, in accordance with USSG §5C1.1(b) or (c)(3) is generally appropriate."  USSG §5C1.1, comment. (n.10).  PSR at ¶133.

1.      **The § 1752 Counts**

With respect to the § 1752 counts, she submits the following.  First, as the Court is aware, there is a split among the judges in this district as to the elements of the § 1752 offenses. The DC Circuit heard oral argument on the issue on December 4, 2023 but has yet to rule.[13] The Court rejected Mrs. Borgerding request that it instruct the jury that § 1752 requires the government to prove beyond a reasonable doubt that she had to know the Vice President was in Capitol in order to be found guilty of these offenses.  Under the grouping rules, the two § 1752 convictions add 2-levels

---

[12] She does not thereby waive or abandon any of the objections to the jury instructions or arguments made in her pretrial motions.

[13] *See United States v. Griffin*, No. 22-3042. Ms. Borgerding rejects the government's claim that a 12/30/2020 facebook post where Ms. Borgerding references President Trump's call for people to attend the January 6 rally indicates that she was aware of the certification process.  Gov Sent Memo at 12-13.  One or two messages that do not make explicit reference to the Certification process do not support the government's argument.  She also objects to the statement that the government caused to be included in the PSR at ¶29 ("Mrs. Borgerding was aware of the presence of Congress and Vice President Pence at the Capitol on January 6.").  This is not sufficient to prove that fact beyond a reasonable doubt.  And it makes no difference to the *Griffin* issue because the jury instruction did not require the necessary scienter to prove that the Capitol was a "restricted building" and the Indictment did not include the scienter element.

to the offense level calculation.  Without this grouping adjustment, her total offense level would be eight, with a sentencing range of 0 to 6 months, in Zone A.  Thus, these counts remain in legal limbo. Also, the PSR uses § 2A2.4, the obstruction guideline to score the § 1752 offenses although Appendix A also lists the trespass guideline, U.S.S.G. § 2B2.3 for § 1752 offenses.  Were the trespassing guideline applied to this group offenses, as some courts have done, the total offense level for this group would be lower.  But the total offense level for both groups would remain 10 after the grouping rules were applied.[14]  Thus for purposes of this sentencing hearing, it does not make a material difference.  However, were the civil disorder count be reversed, Mrs. Borgerding reserves her right to argue that the § 1752 offenses should be scored under the trespassing guideline.

### a.  Grouping Departure

Mrs.  Borgerding respectfully requests that the Court depart down to eliminate the additional 2-level enhancement that arises out of the grouping of the civil disorder and § 1752 counts.  *See* U.S.S.G. § 3D1.4, Background ("it is possible that if there are several minor offenses that are not grouped together, application of the rules in this part could result in an excessive increase in the sentence range.  Again, such situations should be infrequent and can be handled through departure.) In this case, the § 1752 offenses are misdemeanors which increase the total offense level by 2.  In this particular case, the conduct charged in these offenses really overlap with the conduct charged in the civil disorder count.

---

[14]  The base offense level under 2B2.3 is 4, with a 2-level enhancement if the offense occurred in a "restricted building" pursuant to § 2B2.3(b)(1)(A)(vii), resulting in a total offense level of 6. However, when the grouping rules are applied, the combined adjusted offense level for both groups would remain 12 pursuant to USSG §3D1.4(a), (b) and (c).  *See* PSR ¶¶ 62-65.  With the § 4C1.1 adjustment, the total offense level would remain 10.  PSR ¶¶ 65-68.

## 2.    The Zero-Point Adjustment in § 4C1.1 Applies in this Case

This Court has rejected a number of the boiler-plate arguments the government makes in opposing the zero-point adjustment in § 4C1.1.  *See United States v. Horn*, 21-cr-00301-TJK.[15] Several other judges have also rejected the arguments

The government claims that the PSR included the § 4C1.1 adjustment "without further analysis."  First, no analysis is necessary when the factors set out in § 4C1.1 are met.  Moreover, the PSR does include a very cogent explanation:

> The Probation Office contends that the defendant's conduct does not translate to her directly using violence or credible threats of violence in connection with the offense. The Government referenced US Capitol Police Lieutenant Van Benschoten's testimony which states, he had to run back to the Capitol to 'create a secondary police line' and that, during this time *rioters* were running after him. Lieutenant Van Benschoten also testified that "he and his colleagues were outnumbered by the *people in the crowd*." Also, according to testimony by US Capitol Police Officer Carrion, he did not 'know the mindset of the individuals or *what their* intent [was]." While the defendant's conduct, along with the conduct of every rioter, collectively, contributed to placing numerous law enforcement officers in a perilous situation, there are no specific acts directly attributable to the defendant which would preclude her from consideration of this adjustment.  Moreover, to withhold applying the adjustment on this basis would create a situation where the actions of rioters who did directly use violence or credible acts of violence cannot be distinguished from those who did not. Therefore, the Probation Office believes this adjustment was appropriately applied, and no further changes were made to the PSR pending the Court's ruling on this contested issue.

PSR at 27 (Addendum).  Indeed, the explanation by the Probation Officer is consistent with the reasoning of the judges in this district.  The cases the government cites to the contrary are factually inapposite.

---

[15] While the Court did not issue an opinion, counsel for Mr. Horn has advised undersigned counsel that the Court applied the § 4C1.1 downward adjustment in *Horn.*

The government claims that Mrs. Borgerding does not qualify because she "under the totality of circumstances" her conduct amounts to "credible threats of violence." In the most thorough opinion addressing the application of § 4C1.1 to January 6 defendants generally and to a defendant convicted of civil disorder, Judge Bates rejects each and everyone of the government's arguments. *See United States v. Yang,* 2024 WL 519962 (D. D.C. 2024). In particular, Judge Bates addressed the "credible threats of violence" subsection but also the same general objections the government makes here:

> The government also advances a broader argument: that § 4C1.1 should not apply here – and presumably not in any January 6 case – because "[e]very rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to" the manifold harms of that day. There is truth to the government's general point. But it does not follow that the Court can disregard the inherently individualized analysis contemplated by § 4C1.1 in general and by the plain text of § 4C1.1(a)(3) in particular. The relevant text requires that "the defendant did not use violence or credible threats of violence in connection with the offense." U.S.S.G. § 4C1.1(a)(3) (emphasis added). The inquiry turns on the actions of the defendant himself or herself, not the actions of others. This plain reading is reinforced by the contrast with the language of the very next provision, which requires that "the offense did not result in death or serious bodily injury." U.S.S.G. § 4C1.1(a)(4) (emphasis added). The Sentencing Commission and Congress knew how to frame a disqualifying factor in terms of the broader "result" of an offense and did so in subsection (a)(4), but (a)(3) is framed specifically in terms of actions taken by a defendant himself.
>
> The Court thus rejects the government's violence-by-presence theory of § 4C1.1(a)(3). In so doing, it joins the view of at least six other judges in this District. *See United States v. Hernandez*, No. 21-445 (CKK), ECF No. 65, at 6–8 (D. D.C. Jan. 31, 2024); *United States v. Bauer*, No. 21-3862-2 (TNM), 2024 WL 324234, at *4 (D.D.C. Jan. 29, 2024); *United States v. Isaacs*, No. 22-338 (DLF) (D.D.C. Jan. 12, 2024) (oral ruling); *United States v. Parks*, No. 21-411-1 (APM) (D.D.C. Nov. 15, 2023) (oral ruling); *United States v. Eicher*, No. 22-38 (BAH), ECF No. 103, at 45–47 (Sept. 15, 2023) (oral ruling);

*United States v. Weyer*, No. 22-40 (JEB) (D.D.C. Sept. 14, 2023) (oral ruling) (concluding that § 4C1.1 reduction would "likely" apply). The government has not cited, and the Court is not aware of, any case reaching the opposite conclusion.

The government further suggests that § 4C1.1 should not apply because it is "based on recidivism data for offenders released in 2010," and "there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6." This argument fails for multiple reasons. To begin, speculation about the underlying analysis behind a Guidelines amendment is not a valid basis to disregard the Guidelines as enacted. See Turner, 21 F.4th at 864 (noting courts' obligation to "correctly calculate[e]" the Guidelines range). Further, § 4C1.1 did not become effective until November 2023. The Sentencing Commission (and Congress) had almost three years after January 6 to craft a carveout excluding January 6 defendants from § 4C1.1's potential benefit but did not do so. And finally, there is no indication that § 4C1.1's animating rationale does not hold true in this context—i.e., that despite the unprecedented nature of January 6, rioters with zero criminal history points who meet the other criteria may still be less likely to recidivate than those with prior criminal records. See Eicher, Crim. A. No. 22-38, ECF No. 103 at 46.

The government's final contention is that, if the Court applies § 4C1.1, it "should nevertheless vary upwards by two levels to counter any reduction in offense level." Yang Gov't Sent'g Mem. at 18. The government does not ground this request in any Guidelines provision, and the Court declines to simply add offense levels to "offset" the operation of § 4C1.1—or the application of any other Guidelines provision. The Court will, as it does in each of these cases, look to the events of January 6 and the defendant's involvement as part of a holistic assessment of the § 3553(a) factors to determine whether a variance is warranted.

The government further suggests that § 4C1.1 should not apply because it is "based on recidivism data for offenders released in 2010," and "there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6." This argument fails for multiple reasons. To begin, speculation about the underlying analysis behind a Guidelines amendment is not a valid basis to disregard the Guidelines as enacted. Further, § 4C1.1 did not become effective until November 2023. The

Sentencing Commission (and Congress) had almost three years after January 6 to craft a carveout excluding January 6 defendants from § 4C1.1's potential benefit but did not do so. And finally, there is no indication that § 4C1.1's animating rationale does not hold true in this context – *i.e.*, that despite the unprecedented nature of January 6, rioters with zero criminal history points who meet the other criteria may still be less likely to recidivate than those with prior criminal records.

The government's final contention is that, if the Court applies § 4C1.1, it "should nevertheless vary upwards by two levels to counter any reduction in offense level." The government does not ground this request in any Guidelines provision, and the Court declines to simply add offense levels to "offset" the operation of § 4C1.1 – or the application of any other Guidelines provision. The Court will, as it does in each of these cases, look to the events of January 6 and the defendant's involvement as part of a holistic assessment of the § 3553(a) factors to determine whether a variance is warranted.

*United States v. Yang*, No. CR 23-100 (JDB), 2024 WL 519962, at *4–5 (D.D.C. Feb. 9, 2024) (internal citations omitted).

Added to this list should be *United States v. Palm*, 21-cr-393 (RDM). In his oral ruling rejecting the government's broad arguments, Judge Moss noted his own particular familiarity with the guidelines and the Commission's recidivism studies while he served as a member and later Chair of the Criminal Law Committee of the Judicial Conference from 2017 to 2023. And, this Court's own opinion in *Horn*, cited above. In addition, Judge Nichols in *United States v. Doolin*, 21-cr-447, granted a zero-point reduction to someone convicted of civil disorder (among other things) for participating in the heave-ho in the tunnel. And, Judge Chutkan also granted the § 4C1.1. adjustment in *United States v. Harrington*, No. 24-cr-00175-TSC.

Judge Bates also rejected the more specific argument the government makes here with respect to "threats of violence."

23

Neither § 4C1.1 nor other provisions in the Guidelines define the terms "use violence" or "use ... credible threats of violence." And the D.C. Circuit has not interpreted these terms as used here. Accordingly, the Court will look to the plain meaning of the terms at the time of enactment.

Contemporary dictionaries define "violence" as "[t]he use of physical force, usu[ally] accompanied by fury, vehemence, or outrage; esp[ecially], physical force unlawfully exercised with the intent to harm," or as "the use of physical force so as to injure, abuse, damage, or destroy," These definitions draw additional support from case law interpreting "violence" in similar contexts.

A "credible" threat is one that "offer[s] reasonable grounds for being believed or trusted." *see also United States v. Bauer*, 21-3862-2 (TNM), 2024 WL 324234, at *3 (D.D.C. Jan. 29, 2024) ("[A] 'credible threat of violence' is a believable expression of an intention to use physical force to inflict harm."). Courts properly look to "contextual evidence" to determine whether a threat is credible.

As Judge Bates also noted, the § 4C1.1(a)(3) "violence" determination is necessarily case-specific.  The cases "cited by the government where courts declined to apply § 4C1.1 all involved much more aggressive conduct than that at issue here.  *See, e.g.*, *United States v. Gundersen*, No. 21-137 (RC), ECF No. 72, at 50 (July 25, 2023) (defendant "rushed [an officer] and forcefully slammed his heavy body into the officer's riot shield")."  *Yang*, supra at n.4.

*Secor,* which the government cites to support its argument that Mrs.  Borgerding used "threats of violence" is easily distinguishable as Secor engaged in direct, physical confrontation with law enforcement officers and more.  Indeed, Secor had been originally charged with assault and pleaded down to a § 1512 offense.  As Judge McFadden explained in declining to apply the § 4C1.1 adjustment:

And his time in the Capitol was no mere walking tour. Instead, he actively opposed police and aided other rioters. He, along with two dozen other rioters, confronted and overwhelmed three U.S. Capitol

Police officers who were guarding the East Rotunda doors. He "threw [his] weight against the doors," "trapp[ing] the three Capitol Police officers against" them. He and the other rioters thus breached the East Rotunda doors, "overpower[ing] the officers" and helping other rioters enter the building.

After overwhelming the officers, Secor made his way to the Senate Chamber. He entered through the Senate Gallery, Once on the floor, he sat in the Vice President's chair on the Senate Dias for two minutes. After doing so, he left the building.
. . .

[T]he Government's chief argument is that Secor used credible threats of violence. An individual makes a credible threat of violence under § 4C1.1(a)(1) when he "believabl[y] express[es] an intention to use physical force to inflict harm." The Government argues that Secor's conduct in helping breach the East Rotunda doors constituted a credible threat of violence. The Court agrees.

Secor joined a mob of two dozen others and worked with them to box outnumbered police officers against a door. With the officers vastly outnumbered, and their backs to the wall, Secor and the mob pushed themselves forward, throwing their weight against the officers and doors. Secor "brac[ed] his body against the backs of the other rioters as they pushed," "ultimately overpower[ing] the officers" and forcing them to give way.

A reasonable officer in the position of the three Secor confronted would have perceived his conduct to be a credible threat of violence. Consider what those officers encountered. Three officers were confronted by a crowd of 25 rioters – eight times their number. Those rioters backed the officers against a closed door, denying them any readily accessible retreat. Id. They then advanced toward the officers, pushing against them and forcing their backs further to the door. Id. An officer in this situation would reasonably conclude that the members of the crowd intended to harm him.

*United States v. Secor*, No. 1:21-cr-00157 (TNM), Memorandum Order, Docket No. 63 (internal

citations omitted). Clearly, Mrs. Borgerding's conduct is not at all like Secor's, who directly engaged

in aggressive conduct that "boxed" officers against a wall and engaged in other physical

confrontations, which a grand jury had earlier determined amounted to assault.

Judge Bates also rejected the "credible threats of violence" argument based on post-offense rhetoric of the second defendant in *Yang*, a ruling that is quite apposite to Mrs. Borgerding's case.

> While Boulton's rhetoric is concerning, he made these statements after the fact, apparently while driving home to Georgia. And in assessing whether a threat is "credible," courts routinely look to contextual evidence, including the defendant's ability to make good on the threat. *See Johnson*, 64 F.4th at 1352 (emphasizing that the defendant "was ... armed," "had been convicted of several violent crimes, including shooting someone," and had a powerful motive to carry out the threat); *see also United States v. Miller*, No. 22-495 (PAB), 2024 WL 363731, at *4 (N.D. Ohio Jan. 26, 2024) (collecting case law and concluding that a common element is "some temporal and spatial proximity between the defendant, his threat, and his intended victim"). That is not to say that an after-the-fact threat can never be credible for purposes of § 4C1.1. But after considering all the circumstances present here – including the nature of Boulton's statements, his conduct on January 6, and the fact that these statements occurred after the offense when Boulton was no longer present in D.C. – the Court concludes that any threats made by Boulton were not "credible threats of violence [used] in connection with the offense." Hence, the Court concludes that Boulton is also eligible for the two-level reduction under § 4C1.1.

*Yang*, *supra,* at *5. The same analysis applies to Mrs. Borgerding's post-January 6 statements. She made no threats while in DC on January 6 and has not history of violent conduct.

Accordingly, the Court should apply the 2-level downward adjustment under § 4C1.1.

### 3. Mrs. Borgerding Has Not Denied the Essential Facts

Mrs. Borgerding should receive a 2-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 (n.2). As noted by the PSR at ¶ 37, this application note provide, in pertinent part, that "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the

applicability of a statute to his conduct)" she may be entitled to a downward adjustment under this guideline. That is precisely what Mrs. Borgerding has done in this case. She has challenged her prosecution on First Amendment and other legal grounds. She did not testify to challenge the facts. She gave a lengthy interview to the FBI admitting her conduct. While the PSR does not award a downward adjustment, the Court should. Or at a minimum, the Court should consider the legal rather than factual nature of Mrs. Borgerding's defense as a mitigating factor in determining the sentence.

### D.    Post-Offense Conduct Also Merits a Downward Variance

Imprisonment here is unnecessary because Mrs. Borgerding's conduct throughout her life ain in the more than three years since she's been on pretrial release show that she will not return to criminal behavior and is not a danger to society. *See Pepper v. United States*, 562 U.S. 476, 491 (2011) (district court may consider evidence of the defendant's post-offense conduct and may rely on such evidence to support a downward variance).

> In assessing ... deterrence, protection of the public, and rehabilitation, 18 U.S.C. § 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence than a defendant's post-incarceration conduct". Post[offense] rehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in § 3553(a)(2).
> . . .
> Pepper's post[offense] conduct also sheds light on the likelihood that he will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence. *See* §§ 3553(a)(2)(B)-(C); *Gall v. United States*, 552 U.S. 38, 59 (2007) ("Gall's self-motivated rehabilitation ... lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts" (citing §§ 3553(a)(2)(B)-(C))).

### E.      Unwarranted Disparity

Imposing a term of imprisonment in this case – in light of the entirety of the mitigating circumstances, Mrs.  Borgerding's offense conduct and the guidelines calculation is unwarranted. A sentence other than probation for Mrs.  Borgerding would result in unwarranted disparity in light of a number of other cases including this Court's sentence of probation in *United States v. Colon*, 21-CR-160-2.

### 1.      *United States v.  Colon*.

Colon was a member of the Kansas City chapter of the Proud Boys.  He brought a gun with him to DC, although he did not carry it with him while at the Capitol.  However, he engaged in pre-planning chats where some members of the group discussed violence.  On January 6, he "purchased a modified axe handle that he could use as a walking stick and weapon," carried a pocket knife, tactical vest, tactical gloves, boots, and a helmet.[16]

> A "group of rioters that included Colon and other Kansas City Proud Boys chased police officers out of the Crypt and into a passageway or lobby leading to the Capitol Visitor Center. While the police were fleeing, several feet in front of Colon, a large metal door began lowering from the ceiling. The officers retreated behind the descending gate and tried to help it close while rioters tried to keep it open. In front of Colon, rioters threw a trash can at the officers and attempted to slide pieces of furniture into the door's path.
>
> Before long, the officers yielded, and the crowd (with Colon just a few people back) continued moving forward. Although the officers had all fled, the door was still activated and continued to close. But members support of the Kansas City Proud Boys group with Colon just in the of the door, replacing a smaller chair that another rioter had placed there: Shortly thereafter, Colon himself placed a chair into the path of another door in the area.

*Id*. at 6-7.

---

[16]   *Colon*, Gov Sent'g Memo (ECF 276 at 3)

### 2.     *United States v. Sandra Parker*, No. 21-cr-028 (APM).

Mrs. Parker was charged and convicted after trial in a multi-count indictment brought against the Oath Keepers that included civil disorder and the 1512 obstruction charge. She entered the Capitol with the Oath Keeper "stack" through the same doors that Mrs. Borgerding entered. The civil disorder count was predicated on her surge with a group of Oath Keepers and others in a hallway that led to the Senate chambers. Like Mrs. Borgerding, she is a life-long resident of Ohio in her 60s. Judge Mehta sentenced her to 60-months probation. Judgment (ECF 1062). Judge Mehta also sentenced another one of the Oath Keepers, convicted in that same trial on the same multiple offenses to 60-months of probation with the first 18-months on home detention, *United States v. William Issacs*. Judgment (ECF 1054).

### 3.     *United States v. Hart*, No. 21-cr-540 (DLF)

Judge Friedrich sentenced Mr. Hart to 36-months of probation, with 45 days of home detention with electronic monitoring on a 231 conviction. Judgment (ECF 74). His conduct was more violent and aggressive than that which Mrs. Borgerding stands convicted. In addition to participating in one of the first breaches of the fences surrounding the Capitol at 12:45 pm, he encouraged others to move forward. He exited the Capitol at 3:06 pm, after having spent 21 minutes inside.

> Hart, wearing a red hood with a black hat and sweatshirt with a "Q" on it, positioned himself with the other rioters against the fencing, as shown in open-source video2. Amidst screams of profanity towards officers and politicians, rioters on the end of that barricade opposite Hart *violently engaged with U.S. Capitol Police officers and began rocking and shoving the barricades*. Hart joined the other rioters and pushed one such barricade with his hands and his foot, helping to overrun the security checkpoint.
> . . .

The rioters, including Hart, breached the barricades, hopping over the downed fence and  forcing officers to retreat. Hart then joined a multitude of other rioters in rushing onto the restricted area of Capitol grounds. The mob now had direct access to the Capitol building Despite encountering additional lines of police officers and pepper spray, Hart continued with the mob to overrun law enforcement and move closer to the Capitol building. While doing so, he took videos of the riot, using his mobile device and a selfie-stick, as captured in open-source video.   In that video, he also appeared to be wearing a bright orange speaker around his neck.  Having breached the police lines, Hart then encouraged other rioters to move towards the Capitol.

. . .

While in the Rotunda, Hart stopped and smoked marijuana; the event was captured in an Instagram video posted on an account called "brotunda" on or about January 6, 2021 and was captioned, "There were many Brotunda's under the Rotunda that day…"
. . .
Hart was interviewed by law enforcement. During the interview he attempted to minimize his involvement, suggesting he did not push the barricade and that he was not, in fact, encouraging other rioters to get closer to the Capitol by waving them forward. Instead, he stated he was waving in an attempt to tell rioters to get down from scaffolding.

Gov Sent'g Memo (ECF 69) at 4-12 (Images omitted).

### 4.    Non-January 6 Cases

In four different cases arising out of political demonstrations involving physical assaults on police officers, two of the cases were dismissed outright; one was dismissed on a deferred prosecution agreement after a 6-month probationary period.  In a fourth case, involving a violent assault on a police officer, the defendant was sentenced to 4 months in prison.  All the cases were prosecuted by the United States Attorney's Office in the District of Columbia but charged in Superior Court.

In *United States v. Ruben Camacho*, No. 2023 CMD 008424, the US Attorney entered into a 6-month deferred prosecution agreement with a person who "slammed MPD Officer Beaman against the wall, then struck the Officer in the right side of her face with a loose grip fist, causing the

Officer and Camacho to fall to the ground." *Id.* Statement of charges; Deferred prosecution agreement in case docket. The incident arose out of a violent demonstration outside the DNC in November 2023, Congressional leaders where meeting inside.[17]

In *United States v. Alanna Rogers*, Case No 2020-CF3-006970 charges were dismissed in a case where the defendant was charged with felony assault on an MPD police officer while armed for, among other things, "throwing a firework at police officers, burning the trousers of one police official, during a declared riot that took place on August 30 and carried over to August 31, 2020." USAO-DC press release No. 20-107, 9/11/2020; *see also* Gerstein Affidavit docketed in the case. On September 30, 2020, the charges were dismissed. *See* Nolle Prosequi Notice docketed in the Superior Court case file. The riots that took place in the summer of 2020 were described by the DC Circuit as "peaceful demonstrations *coincided with incidents of rioting, vandalism, looting, and arson*." *Tinius v. Choi*, 77 F.4th 691, 696 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 815 (2024) Several curfew orders that the Mayor entered stated that "Vandals smashed windows in Northeast DC, upper Northwest DC stretching to Georgetown, and caused extensive damage in the Golden Triangle Business Improvement District, Downtown DC Business Improvement District, and Mount Vernon Triangle Community Improvement District." Another Curfew Order stated that "[r]ioting and looting affected the operations of District government agencies." *Id.*

In *United States v. Sermon*, Case No. 2020 CMD 006677, the defendant was charged with assaulting a police officer who was "holding a police line" near Senator Rand Paul; "the defendant punched an MPD officer in the left side of his face. The affidon avit further reports that the officer

---

[17]   Video shows clash outside DNC headquarters that forced lawmakers to evacuate at https://www.cnn.com/videos/politics/2023/11/16/dnc-protest-headquarters-israel-gaza-ctm-vpx.cnn

sustained a laceration and severe swelling above his left eye, was transported to the hospital, and received stitches." near Senator Rand Paul.[18] The charges were dismissed on January 27, 2022. Gov Notice of Nolle Prosequi, filed in case docket.

In *United States v. Dane Powell*, No. 2017 CF2 001405, the defendant was sentenced to 4 months in prison for throwing a brick at a police officer, breaking windows of various businesses, being possession of a hammer, and covering his face to avoid detection arising out of riots that took place near the Inauguration of President Trump in January 2017.

> According to a factual proffer signed by the defendant, on January 20, 2017, Powell joinedtogether with more than 200 other people in and around Logan Circle in Washington, D.C. Thegroup formed a "black bloc" in which individual defendants wore black or dark colored clothing,gloves, scarves, sunglasses, ski masks, gas masks, goggles, helmets, hoodies, and other face-concealing and face-protecting items to conceal their identities in an effort to prevent lawenforcement from being able to identify the individual perpetrators of violence or propertydamage. Some of the members of the black bloc were armed with hammers, crowbars, wooden sticks, and other weapons. Powell was among those dressed in black, and had in his possession agas ask. Powell also attempted to conceal his face with a mask. In addition, *Powell was in possession of a hammer, and a heavy wooden stick with a flag attached to it. As part of the proffer, he admitted being part of a group of rioters who moved approximately 16 blocks over aperiod of more than 30 minutes. He also admitted that he participated in breaking windows at two businesses and throwing a brick, large rock, or piece of concrete at uniformed law enforcemen to officers during the riot.*

USAO Press Release No. 17-144, 7/7/2017 (emphasis added).

---

[18] "Man Charged for Assault on Metropolitan Police Officer Who Was in Proximity to Confrontationof Senator Rand Paul". USAO Press Release, No. 20-122, 9/2/2020.

### F.      Restitution

Mrs. Borgerding objects to the imposition of an Order of restitution.  Federal courts do not have inherent authority to order restitution and may do so "solely pursuant to statute." *United States v. Anderson*, 545 F.3d 1072, 1077 (D.C. Cir. 2008); *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012). None of the offenses of which Mrs. Borgerding stands convicted are listed in 18 U.S.C. § 3663(a)(1)(A) or 3663A(c)(1), which authorizes the court to order restitution if the defendant violates one of the listed statutes.  *Id.*

In addition, on January 6, Mrs. Borgerding entered the Capitol through an open door that had been opened by others unknown to her.  She did not break any windows, did not damage any property and did not assault any law enforcement officers.  In sum, she did not "actually cause" any of the alleged damages.  She therefore is not liable for the damages alleged in paragraph 34 of the Presentence Report.  *See United States v. Jabr,* 4 F.4th 97, 105 (D.C. Cir. 2021) (18 U.S.C. § 3663 "compensate[s] victims only for losses caused by the conduct underlying the offense of conviction."); *see also In re Sealed Case,* 702 F.3d 59, 66 (D.C. Cir. 2012) (defendant  not required "to pay restitution for harm he did not cause").

### CONCLUSION

For all the reasons set out above, Mrs. Borgerding respectfully requests that the Court impose a sentence of probation in light of all the mitigating circumstances set out above.  The sentence takes into account her lack of violence on January 6.  As a 61-year old woman, with no prior convictions, a strong work history, family ties, her medical condition, her need to provide caretaking to her husband, who is 100% disabled as a result of an injury suffered while deployed to the Middle East the sentence provides just punishment.  It also avoids unwarranted disparity as required by 18  U.S.C.

§ 3553(a)(6) and complies with the Guidelines provision that probation is the appropriate sentence for a person, whose sentencing range falls in Zone B.

In sum, a sentence of probation is "sufficient, but not greater than necessary" to impose just punishment, deter, protect the public and provide needed rehabilitation as required by 18 U.S.C. § 3553(a). And, a sentence of "probation, rather than "an act of leniency," is a "substantial restriction of freedom." *Gall v. United States*, 552 U.S. 38, 44 (2007).

Respectfully submitted,

/s/ *Carmen D. Hernandez*

**Carmen D. Hernandez**
Bar No. MD03366
7166 Mink Hollow Rd
Highland, MD 20777
240-472-3391; 301-854-0076 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Motion was emailed this 26th day of August, 2024, to all counsel of record via ECF.

/s/ *Carmen D. Hernandez*

**Carmen D. Hernandez**